PACIFIC LEGAL FOUNDATION et al., Petitioners,

v.

DEPARTMENT OF TRANSPORTATION, Respondent.

Ralph NADER and Public Citizen, Petitioners,

v.

Brock ADAMS, Secretary of Transportation, Respondent,

Ford Motor Company, Intervenor.

Nos. 77–1797, 78–1034.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 21, 1978.

Decided Feb. 1, 1979.

As Amended Feb. 1, 1979

Rehearing Denied March 5, 1979. As Amended April 3, 1979.

Sam Kazman, Washington, D. C., with whom Ronald A. Zumbrun, Robert K. Best, Raymond M. Momboisse, and John H. Findley, Sacramento, Cal., and Albert Ferri, Jr., and Donald C. Simpson, Washington, D. C., were on the brief, for petitioners Pacific Legal Foundation et al.

Alan B. Morrison, Washington, D. C., with whom Thomas K. Wilka, Washington, D. C., was on the brief, for petitioners Ralph Nader et al.

Paul Blankenstein, Atty., Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Washington, D.C., Joseph J. Levin, Jr., Chief Counsel, Frank Berndt, Deputy Chief Counsel, David W. Allen, Asst. Chief Counsel, Nat'l Highway Traffic Administration, Washington, D.C., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief, for respondents Brock Adams and Department of Transp.

John H. Pickering, Washington, D. C., with whom William R. Perlik, William J. Perlstein, and Donald C. Langevoort, Washington, D. C., were on the brief, for intervenor Ford Motor Co.

Before WRIGHT, Chief Judge, WILKEY, Circuit Judge, and FLANNERY,* District Judge.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Chief Judge:

Like Scylla and Charybdis, the petitioners in these two cases challenge from opposite sides Motor Vehicle Safety Standard 208, which requires "passive restraints," such as automatic seatbelts or airbags, in all pas-

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

senger cars sold in this country after September 1, 1983.[1] In No. 77–1797 petitioners argue that there is insufficient empirical support for Standard 208, and that the Secretary of Transportation (Secretary) violated the Motor Vehicle Safety Act of 1966 (Safety Act)[2] by failing to consider public reaction to passive restraints and by ignoring potential hazards posed by them. Petitioners in No. 78–1034, in contrast, insist that the Secretary improperly delayed implementation of the Standard and lacked good cause for permitting car manufacturers to introduce passive restraints gradually, rather than requiring full compliance by the effective date. We find that the Secretary acted within his statutory authority and validly issued the passive restraint order under his rulemaking powers.

## I

After the "first collision" between an automobile and an external object, passenger restraint systems protect against the "second collision" between vehicle occupants and the interior of the car.[3] In 1967 the Secretary of Transportation issued the original Standard 208, requiring seatbelts in all passenger cars to reduce damages from the second collision.[4] By July 1969, however, the Department of Transportation (DOT) concluded that the level of seatbelt use was far too low to reduce traffic injuries to an acceptable level.[5] Consequently, DOT sought to develop "passive restraints" that would protect car occupants automatically. Two currently available systems protect against injuries from the second collision without requiring independent action by motorists. "Passive seatbelts," which function like shoulder belts when in position, deploy around front seat occupants as they enter the car and close the doors, but are largely restricted to use in cars with bucket seats.[6] Airbags are cushions stored under the dashboard that, when triggered by a frontal collision, fill with stored or rapidly generated gas to protect the rider

1. For a description of passive seatbelts and airbags, *see* text at notes 6–8 *infra*.

2. National Traffic & Motor Vehicle Safety Act of 1966, Pub. L. No. 89–563, 80 Stat. 718.

3. The Senate Report on the Safety Act emphasized the importance of the second collision:

 The "second collision"—the impact of the individual within the vehicle against the steering wheel, dashboard, windshield, etc.—has been largely neglected. The committee was greatly impressed by the critical distinction between the causes of the accident itself and causes of the resulting death or injury. * * *

 S.Rep. No. 1301, 89th Cong., 2d Sess. 3 (1966). To reduce injuries from the second collision, dashboards have been padded and collapsible steering columns have been introduced.

4. 32 Fed.Reg. 2408, 2415 (Feb. 3, 1967). The standard was issued under 15 U.S.C. § 1392(a) (1976):

 The Secretary shall establish by order appropriate Federal motor vehicle safety standards. Each such Federal motor vehicle safety standard shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms.

5. 34 Fed.Reg. 11148 (July 1, 1969) (notice of proposed rulemaking):

 The principal disadvantage of safety belts is that only a very low percentage of the motoring population * * * presently takes advantage of the life-saving restraint protection they afford.

 Current use of so-called "active" belts, which require action by the occupant to fasten them, is estimated at about 20%. DOT, Final Rule (Occupant Restraint Systems) (July 5, 1977) at 4, 42 Fed.Reg. 34289, 34290, Joint Appendix (JA) 156, 159 (Decision by Secretary Adams Revising Standard 208) (hereinafter cited as *Adams Decision*). *See* note 53 *infra*. The American public's unwillingness to wear seatbelts persists despite more than two million traffic deaths in this country since the automobile was introduced. S.Rep. No. 481, 95th Cong., 1st Sess. 2–3 (1977) (*quoting* Senator Bentsen). It is estimated that one American dies in a traffic accident every eleven minutes. *Id.*

6. Passive belts are attached to the upper rear corner of the door and the center of the floor of the car. When the door is opened the belt swings toward the dashboard to permit entry and returns to position when the door is closed. Because of the connection to the door, passive belts are largely limited to cars with bucket seats, and DOT estimates that passive belts can be installed in only 25% of American cars, DOT, *Environmental Impact Statement: Occupant Crash Protection*, 37, 52 (June 30, 1977), JA 980–981.

from collision with the car's interior.[7] Both are designed to protect occupants in frontal crashes, so riders must wear lap belts to guard against injury from lateral-impact crashes and roll-overs.[8]

Beginning in May 1970 the agency conducted a lengthy rulemaking proceeding on passenger restraint systems, and in 1972 adopted a rule that established a three-step approach.[9] Between January 1972 and August 1973 new cars would have to be equipped with lap and shoulder belts for front seats, with a warning to go off when the belts were not fastened, and lap belts at other seating positions. From August 1973 to August 1975 new cars would have to provide at least lap and shoulder belts for front seat occupants with an "ignition interlock" system that would prevent the car from starting while those belts were not connected. Finally, after August 1975 new cars would have passive protection for all passengers. The 1972 passive restraint standard, like the rule before us now, was a performance standard. Rather than dictate any particular form of passive protection, the rule established minimum criteria that cars would have to meet.

The 1972 rule foundered both in the courts and in Congress. In December of that year the United States Court of Appeals for the Sixth Circuit ruled that, although "the Agency's decision to require passive restraints is supported by substantial evidence,"[10] its testing procedures did not satisfy the Safety Act's requirement that standards be "objective."[11] The court found that the anthropomorphic dummies used in crash tests had been insufficiently uniform and had not replicated several characteristics of the human body.[12] The ignition interlock system mandated by the second step of the 1972 rule was unaffected by the Sixth Circuit's finding,[13] and briefly increased seatbelt use.[14] By late 1974, however, the nation's irritation at being unable to start a car without fastening the seatbelts drove Congress to ban ignition interlocks and continuous buzzers.[15] That legislation also limited DOT's discretion to amend Standard 208 in the future. If any modification could not be satisfied by a seatbelt system, it would have to be submitted to Congress, which could veto it by concurrent resolution of both houses.[16]

Despite the demise of the 1972 rule, DOT continued to study passive restraints,[17] and in 1976 then Secretary William Coleman initiated a new rulemaking proceeding on the issue.[18] After hearing public testimony

7. *Adams Decision, supra* note 5, at 4, JA 159.

8. *Id.* at 48, JA 203. Secretary of Transportation, Decision Concerning Motor Vehicle Occupant Crash Protection (Dec. 6, 1976), at 61, JA 60, 120 (hereinafter cited as *Coleman Decision* ).

9. 37 Fed.Reg. 3911 (Feb. 24, 1972).

10. *Chrysler Corp. v. Dep't of Transportation,* 472 F.2d 659, 675 (6th Cir. 1972).

11. *See* note 4 *supra* (text of 15 U.S.C. § 1392(a) (1976)).

12. 472 F.2d at 676–678. The particular problems were that the necks of the dummies could be either stiff or very flexible, and the "force deflection characteristics of the dummy's chest" also varied widely.

13. *Ford Motor Co. v. Nat'l Highway Traffic Safety Admin.,* 473 F.2d 1241, 1244 (6th Cir. 1973).

14. The highest level of seatbelt use in interlock-equipped cars was over 60% in 1974, but con-

sumers deactivated many of the interlocks and seatbelt use in those cars quickly fell to 40%. C. Cooke, Usage of Occupant Crash Protection Systems 5 (National Highway Traffic Safety Administration (NHTSA) July 1976), JA 441.

15. Motor Vehicle and Schoolbus Safety Amendments of 1974, Pub.L. No. 93–492, § 109, 88 Stat. 1482 (codified at 15 U.S.C. § 1410b (1976)). The agency dropped the interlock requirement from Standard 208.39 Fed.Reg. 38380 (Oct. 31, 1974); *id.* at 42692 (Dec. 6, 1974).

16. 15 U.S.C. § 1410b (1976).

17. The agency revised the test dummies in response to the Sixth Circuit's *Chrysler* ruling, *see* note 12 *supra.* 38 Fed.Reg. 8455 (April 2, 1973); *id.* at 20449 (Aug. 1, 1973). A passive restraint proposal was announced in March 1974, 39 Fed.Reg. 10271, and extended in August 1975, 40 Fed.Reg. 33977.

18. 41 Fed.Reg. 24070 (June 14, 1976).

and reviewing written comments, Coleman concluded that passive restraints were technologically and economically feasible and would "provide substantially increased protection to the public in traffic accidents * * *." [19] Nevertheless, because he anticipated public resistance to passive restraints, Coleman did not order their introduction. Instead, he proposed to contract with four automobile manufacturers for production of up to 500,000 cars with passive restraints as a demonstration program to smooth public reception of the new safety systems.[20]

The current Secretary of Transportation, Brock Adams, reopened the passive restraint rulemaking only four months after Coleman's decision.[21] Following another round of written comments and a public hearing, Adams issued the mandatory passive restraint rule now before us.[22] Adams squarely rejected Coleman's view of the likely public reaction to passive restraints, which had been based largely on the ignition interlock episode.[23] Adams insisted that the interlock system met with public obloquy because it required affirmative action by the occupant, while passive restraints, by definition, make no such demand.[24] Because passive restraints would not force changes in the public's behavior, Adams concluded, there was no need to wait for a demonstration program to convert public attitudes.

On related issues Adams agreed with Coleman that (1) according to available experimental data and limited field experience, passive restraints could prevent approximately 9,000 deaths and over 100,000 injuries; [25] (2) with these expected benefits reflected in lower insurance premiums, passive restraint systems would not present an unreasonable economic burden for motorists; [26] and (3) possible negative effects, such as accidental deployment of airbags, lower use of lap belts, and possible danger from the gases used in airbags, would be offset by the advantages of passive restraints.[27] The Secretary ordered a "phasing-in" of passive restraint systems. For model year 1982 all new cars with wheelbases above 114 inches would have to be equipped with full passive restraint systems for front seat occupants. In the following year cars with wheelbases between 100 and 114 inches would have to comply, and all 1984 models would be held to the Standard.[28]

Revised Standard 208 was then submitted to the Congress, where no action was taken to veto it.[29] The Secretary rejected petitions for reconsideration from both groups

---

**19.** *Coleman Decision, supra* note 8, at 6, JA 65.

**20.** *Id.* at 11–13, JA 70–72.

**21.** 42 Fed.Reg. 15935 (March 24, 1977).

**22.** Both Adams and Coleman considered the feasibility of mandatory seatbelt laws, which are in effect in 20 other nations, but concluded that such statutes could not be enacted in this country. *Coleman Decision, supra* note 8, at 58–59, JA 117–118; *Adams Decision, supra* note 5, at 13–15, JA 168–170.

**23.** *Coleman Decision, supra* note 8, at 11, 56, JA 70, 115.

**24.** *Adams Decision, supra* note 5, at 8, JA 163.

**25.** *Id.* at 53, JA 208. These estimates were derived from experimental data. For serious injuries from frontal crashes, for example, airbags with lap belts were considered .66 effective, meaning such injuries would decline by two thirds, while lap belts alone had a rating of .40. NHTSA, "Explanation of Rulemaking

Action (Effectiveness)," 7–10 (July 26, 1977), JA 258–261 (hereinafter cited as *Explanation*). The effectiveness estimates then were multiplied by the expected utilization level of the safety device and by the injuries and fatalities that would otherwise be anticipated.

**26.** *Adams Decision, supra* note 5, at 21–26, JA 176–181.

**27.** *Id.* at 26–34, JA 181–189.

**28.** *Id.* at 41–42, JA 196–197.

**29.** No action was taken by the full House of Representatives. The Consumer Subcommittee of the Senate Committee on Commerce, Science and Transportation held four days of hearings on the *Adams* ruling, and the full committee issued a report endorsing the new Standard 208. S.Rep. No. 481, *supra* note 5. That report was adopted by the Senate. 123 Cong. Rec. S17016 (daily ed. Oct. 12, 1977).

participating in these cases,[30] and these appeals followed.

## II

Our review proceeds under both the informal rulemaking provision of the Administrative Procedure Act (APA)[31] and the substantive sections of the Motor Vehicle Safety Act. The latter statute requires that Motor Vehicle Safety Standards "shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms."[32] In addition, the Secretary must "consider relevant available motor vehicle safety data"[33] and determine the appropriateness of the standard for the type of vehicle covered by it.[34] As applied, these standards can be tested as part of our "thorough, probing, in-depth review" of the record on appeals of informal rulemaking

under the APA.[35] Of course, we may not substitute our judgment for the agency's. Still, we must determine that the agency action was consistent with its statutory mandate, rational, and not arbitrary. As this court noted in an earlier Safety Act case, a court must decide "whether the agency has performed in accordance with the Congressional purposes." In that effort

> [t]he paramount objective is to see whether the agency, given an essentially legislative task to perform, has carried it out in a manner calculated to negate the dangers of arbitrariness and irrationality in the formulation of rules for general application in the future. * * * [36]

In addition, because the order under review here reversed a prior policy, the agency must provide "an opinion or analysis indicating that the standard is being changed and not ignored, and assuring that it is

---

**30.** 42 Fed.Reg. 61466 (Dec. 5, 1977).

**31.** 5 U.S.C. § 553 (1976). Section 103(b) of the Safety Act, 15 U.S.C. § 1392(b) (1976), states that the APA "shall apply to all orders establishing, amending, or revoking a Federal motor vehicle safety standard * * *." With respect to occupant crash protection standards promulgated under the congressional review procedures the Act specifically provides that "Section 553 of [the APA] shall apply to such standard[.]" 15 U.S.C. § 1410b(c)(2) (1976).

**32.** 15 U.S.C. § 1392(a) (1976).

**33.** 15 U.S.C. § 1392(f)(1) (1976).

**34.** 15 U.S.C. § 1392(f)(3) (1976).

**35.** *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 425, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). All parties agree that judicial review in this case is limited to determining whether the promulgation of the safety standards in suit is arbitrary and capricious under 5 U.S.C. § 706(2)(A) (1976). It might be argued, as the Sixth Circuit apparently did in *Chrysler Corp. v. Dep't of Transportation, supra* note 10, 472 F.2d at 668, that since the Safety Act requires that "all of the evidence before the agency * * * shall be included in the record" submitted to the reviewing court, 28 U.S.C. § 2112(b) (1976) (referred to by 15 U.S.C. § 1394(a)(1) (1976)), we must apply the "substantial evidence" standard for review of the record underlying agency action. This position is strengthened by the provision in the 1974 Amendments to the Safety Act that the Secretary must hold a public hearing on any pro-

posed passive restraint standard, 15 U.S.C. § 1410b(c)(2) (1976). Thus the action in this case might be seen to trigger the substantial evidence test for cases "reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(E) (1976).

We do not follow this reasoning because we agree with the emerging consensus of the Courts of Appeals that the distinction between the arbitrary and capricious standard and substantial evidence review is largely semantic, and that "in the review of rules of general applicability made after notice and comment rulemaking, the two criteria to tend to converge." *Associated Industries of New York State, Inc. v. Dep't of Labor,* 487 F.2d 342, 349–350 (2d Cir. 1973). *See Paccar, Inc. v. Nat'l Highway Traffic Admin.,* 573 F.2d 632, 636 (9th Cir. 1978); *American Public Gas Ass'n v. FPC,* 186 U.S.App.D.C. 23, 36, 567 F.2d 1016, 1029 (1977). Since our review in this case, under *Overton Park,* involves a complete examination of the record, we agree with Judge Lumbard that "when an agency engages in substantive rulemaking, it abuses its discretion (or acts arbitrarily and capriciously) if its actions are not supported by substantial evidence." *Nat'l Nutritional Foods Ass'n v. Weinberger,* 512 F.2d 688, 705 (2d Cir. 1975) (Lumbard, J., concurring in the result).

**36.** *Automotive Parts & Accessories Ass'n v. Boyd,* 132 U.S.App.D.C. 200, 208, 407 F.2d 330, 338 (1968). *See Weyerhauser Co. v. Costle,* 191 U.S.App.D.C. 309, 324–325, 590 F.2d 1011, 1026–1027 (D.C.Cir. 1978).

faithful and not indifferent to the rule of law."[37]

## III

Petitioners Pacific Legal Foundation *et. al.* offer three major reasons for overturning revised Standard 208: (A) that experimental and real-world data do not support the Secretary's findings on the effectiveness of airbags; (B) that the Secretary violated the Safety Act by failing to consider public reaction to the revised Standard; and (C) that the rule ignores collateral dangers to public safety posed by airbags.[38]

### A. *Effectiveness of Passive Restraints*

█ Petitioners concede that seatbelts, including passive belts, are an effective passenger restraint system. They challenge, however, DOT's conclusion that laboratory tests and limited field experience establish the reliability of airbags which, given current technology and the rule before us, would probably have to be installed in 75 percent of American cars.[39] After reviewing the record in this case, we find that the Secretary's decision was rational.

Since this rulemaking began in 1969 DOT has conducted over 2,000 crash tests of airbags, including 188 with human volunteers in the vehicles, 274 with dummies,[40] and a handful with cadavers and baboons.[41] Following these experiments, involving collisions at speeds of up to 50 miles per hour, the agency concluded that if airbags were installed in all cars over 9,000 fatalities and over 100,000 injuries would be averted.[42] When these figures were first released the Secretary conceded that "[s]imulations can, of course, never duplicate * * * real-world collisions and thus there is greater uncertainty in the accuracy of the estimates * * *."[43] Nevertheless, carefully conducted tests can provide the basis for a standard under the Safety Act. As the Sixth Circuit acknowledged in *Chrysler*, the statute authorizes safety standards that push the automobile industry beyond present engineering capabilities,[44] and such standards could not be developed without heavy reliance on experimental simulations. A necessary corollary to this position is that DOT must monitor closely the road experience with any standard based on experimental data and make needed modifications.[45]

Petitioners also insist that the Secretary's conclusion on airbag effectiveness is contradicted by experience with the 12,000 airbag cars currently in operation in this country.[46]

---

**37.** *Columbia Broadcasting System, Inc. v. FCC,* 147 U.S.App.D.C. 175, 183, 454 F.2d 1018, 1026 (1971) (footnote omitted).

**38.** In reviewing these claims we refer to both the ruling issued directly by Secretary Adams and the *Explanation, supra* note 25, issued by NHTSA three weeks later.

**39.** *See* text and note at note 6 *supra.*

**40.** About three fifths of the tests with dummies (156) took place after the Sixth Circuit's *Chrysler* ruling, *see* text and notes at notes 12 & 17 *supra*, with dummies modified to meet that court's objections. Structures Research Division, "Restraint System Testing" (Sept. 23, 1977), JA 1135–1152.

**41.** *Id.*

**42.** *See Coleman Decision, supra* note 8, at 40, JA 99; *Adams Decision, supra* note 5, at 53, JA 208.

**43.** *Coleman Decision, supra* note 8, at 39, JA 98.

**44.** *Chrysler Corp. v. Dep't of Transportation, supra* note 10, 472 F.2d at 672–673.

In summary, the Agency is empowered to issue safety standards which require improvements in existing technology or which require the development of new technology, and it is not limited to issuing standards based solely on devices already fully developed. * * *

*Id.* at 673.

**45.** DOT has expressed its intention to conduct an "intensive monitoring program to oversee the implementation plans * * *." *Adams Decision, supra* note 5, at 41, JA 196. The agency's failure to respond to negative field results was part of the basis for the Ninth Circuit's recent finding that a truck brake standard was not "practicable." *Paccar, Inc. v. NHTSA, supra* note 35.

**46.** The American airbag "fleet" consists of 10,-281 cars produced on assembly lines, primarily large General Motors cars. The others are "special manufacturers' test vehicles" used only in government and business fleets. DOT,

Indeed, there have been more fatalities in frontal accidents involving airbag cars than the statistical projections from experimental data would have indicated.[47] Nevertheless, in view of the relatively small sample involved,[48] and the extraordinary nature of several of the accidents,[49] this variation does not undermine the agency's conclusion that airbags are effective. Moreover, airbags have been very effective in reducing or preventing major injuries.[50]

### B. *Public Reaction*

 Petitioners assert that the Secretary violated his statutory mandate by refusing to consider public reaction to his decision. The importance of popular response, they contend, can be seen in the Safety Act's requirements that a safety standard be "practicable."[51] The Secretary stated in his order, however, that "public acceptance or rejection of passive restraints is not one of the statutory criteria which the Depart-

ment is charged by law to apply in establishing standards."[52] Although we agree with petitioners' view of the requirements of the Safety Act, we believe that the Secretary did take public reaction into account and satisfactorily explained his conclusion that widespread public resistance to passive restraints is unlikely.

Much as economic analysis must evaluate both supply and demand conditions, motor vehicle safety standards cannot be considered practicable unless we know both that the needed production capability is within reach and that motorists will avail themselves of the safety system. Indeed, the protracted effort to install passive restraints has been dictated by the public's steadfast refusal to use seatbelts voluntarily.[53] We believe that the agency cannot fulfill its statutory responsibility unless it considers popular reaction. Without public cooperation there can be no assurance that a safety system can "meet the need for

"An Analysis of Fatalities in Cars Equipped with Air Bags" (Oct. 3, 1978) at 1 (hereinafter cited as *Fatalities* ).

**47.** Five deaths have occurred in airbag cars in frontal crashes. By the agency's estimates of airbag effectiveness, no more than one fatality would have been expected. DOT Office of Statistics and Analysis, "Statistical Analysis of Air Bag Deaths" at 5–6 (April 9, 1976). These figures may not undermine the agency's estimates of airbag effectiveness, however. *See* note 49 *infra*.

**48.** The data are drawn from over 200 crashes. *Fatalities, supra* note 46, at 1. A leading study of seatbelt effectiveness, in contrast, analyzed over 15,000 towaways. NHTSA, "A Statistical Analysis of Seat Belt Effectiveness in 1973–1975 Model Cars Involved in Towaway Crashes" 63 (Sept. 1976), JA 477. With a small sample, statistical projections of probabilities are less reliable. *See* R. Beals, Statistics for Economists 161, 187 (1972).

**49.** In one an infant lying unrestrained on the front seat of the car was killed; another involved a head-on crash between two cars with a combined speed exceeding 100 miles per hour; the driver's side of the car was crushed by a tractor-trailer in a third fatal crash. *Fatalities, supra* note 46, at 1. It is doubtful that any passenger restraint system could have prevented those deaths.

**50.** The Secretary estimated that for the airbag fleet between 1973 and 1975, 60 injuries would have been expected in frontal crashes if the

airbags did not deploy. Only 29 injuries were reported, "indicating an effectiveness factor of 0.52." *Adams Decision, supra* note 5, at 19, JA 174. The study attempted to account for possible bias resulting from the makeup of the airbag fleet (large, new cars) and from incomplete reporting of accidents. *Id.* at 18–19, JA 173–174.

The Secretary also reviewed several submissions by commenters to the rulemaking proceedings that presented conflicting estimates of airbag effectiveness based on both empirical and field data. *Id.* at 16–18, JA 171–173. After criticizing the methodologies used in the submissions, he reasonably concluded that the variance of predictions reflected the inherent uncertainty of such projections, but that, since some estimates were higher than the agency's and some were lower, there was no cause for rejecting DOT's projections.

**51.** 15 U.S.C. § 1392(a) (1976).

**52.** *Adams Decision, supra* note 5, at 8, JA 163.

**53.** Although combined lap and shoulder belts offer protection roughly equivalent to passive restraints, *see Explanation, supra* note 25, at 11, JA 262, voluntary usage is currently estimated at 16% for combined lap/shoulder belts, with an additional 4% wearing only lap belts. C. Cooke, *supra* note 14, at 4, 11, JA 440, 447. *See Chrysler Corp. v. Dep't of Transportation, supra* note 10, 472 F.2d at 674.

motor vehicle safety." [54] And it would be difficult to term "practicable" a system, like the ignition interlock, that so annoyed motorists that they deactivated it.

Despite the Secretary's claim that he need not consider the response to the new standard, he adequately justified his action in terms of the anticipated public reaction. As noted earlier, Adams distinguished the ignition interlock affair from passive restraints on the basis of the nature of the intrusion on the individual. Passive restraints do not require independent action by passengers to activate them. [55] In the 1976 decision Secretary Coleman characterized his estimate of public resistance as "a matter of judgment." [56] In our view Secretary Adams provided a sufficient explanation why his judgment differed from his predecessor's. [57] And on several other issues, including airbag cost [58] and maintenance, [59] Adams explicitly discussed the relationship between the revised Standard and public attitudes.

■ Petitioners raise two related points. First, they argue that the Secretary's calculations of expected benefits from passive restraints fail to take into account the possible deactivation of systems by individual motorists, as was common with the ignition interlock. If Secretary Adams correctly anticipates minimal popular resistance to passive restraints, petitioners' argument has no force. In addition, experience with approximately 65,000 cars equipped with passive seatbelts, which are admittedly more intrusive than airbags, indicates a low deactivation rate. [60] We see no basis here for disturbing the DOT rule, especially since the agency's injury-reduction estimates were revised downward by projecting less-than-total compliance with Standard 208. [61]

■ Second, petitioners contend that installation of passive restraints may deter use of lap belts, noting that even if passive restraints are in place lap belts are needed to protect motorists in nonfrontal collisions. A drop in lap belt use would result in higher fatalities and injuries. DOT defends its estimate that lap belt use will continue at the 20 percent level, citing an agency study concluding that with no further need for more intrusive shoulder belts, lap belt use would actually increase to 26 percent. [62] Petitioners point to nothing in the record to refute the agency's estimates. [63]

### C. Collateral Dangers

■ Airbags may also present collateral dangers to the public, petitioners argue, which are not justified by the expected benefits from Standard 208. We note at the outset that the Safety Act charges the Secretary with authority to balance present injuries against possible risks posed by safety equipment. As this court has observed:

---

**54.** 15 U.S.C. § 1392(a) (1976).

**55.** Passive belts, of course, do involve somewhat more of an intrusion than do airbags, which are tucked away in the dashboard. Still, the observed use rate for passive belts is quite high. *See* text and note at note 60 *infra.*

**56.** *Coleman Decision, supra* note 8, at 6, JA 65.

**57.** *See* text at notes 23–24 *supra.*

**58.** *Adams Decision, supra* note 5, at 21–26, JA 176–181.

**59.** *Id.* at 31–32, JA 186–187.

**60.** Approximately 80% of the passive belts were in use. *Explanation, supra* note 25, at 15, JA 266.

**61.** The agency projected passive belt usage of 60% and airbag usage of 98%. *Coleman Decision, supra* note 8, at A–7, JA 132.

**62.** C. Cooke, *supra* note 14, at 11, JA 447. In addition, the agency argues in its brief that if lap belt use dropped to zero there would still be a net reduction in deaths and injuries from accidents. This claim derives from calculating the expected injury level with airbags but not lap belts, and adding those injuries that are currently prevented by use of lap belts alone. The total, the agency contends, is less than the present injury level.

**63.** Petitioners have submitted to this court several DOT publications on airbags that suggest that occupants will no longer need to wear lap belts. *See* DOT, "Passive Vehicle Occupant Restraints" at 1 (1977), JA 1123 (passive restraints "are systems that protect automobile occupants from collision injuries automatically, without the need to fasten belts or to take any other action"). Such statements may be misleading, and official statements on passive restraints must emphasize the continuing need to use lap belts.

The [agency] must of necessity consider many variables, and make "trade-offs" between various desiderata in deciding upon a particular standard for auto safety. * * * [64]

The major danger associated with airbags is inadvertent deployment that might cause the driver to lose control of the car.[65] There is evidence, however, that such deployments do not present a substantial hazard. In road experience three such incidents have occurred, and none caused a collision or injury,[66] while tests with human volunteers have shown little loss of control by drivers.[67] Moreover, the agency is optimistic that the causes of the three inadvertent deployments are understood and can be remedied,[68] so there is some prospect of reducing their likelihood in the future. Even without such improvements, DOT gauges at one in 200 the chance that in a lifetime an individual would experience an inadvertent deployment as an occupant of a car.[69]

Rapidly inflating airbags also may injure out-of-position passengers in the front seat, especially children. New methods of gas generation, however, permit an initially slower inflation, with the aim of more gently moving the occupant back from the dashboard and out of harm's way.[70]

Finally, the chemical used to generate the gas, usually sodium azide, may present a danger in its own right, either during the car's lifetime or upon its demolition for scrap. But placement of the carefully sealed chemical cannister behind the dashboard should be sufficiently remote to prevent most accidents with it, and the cannister could be removed prior to shredding of the car, as is currently done with batteries and gas tanks.[71]

In view of these circumstances, we cannot conclude that the Secretary abused his discretion in assessing the tradeoffs between the expected benefits and the potential dangers of airbags.[72]

## IV

Petitioners Nader *et al.* present two major challenges to the delayed implementation of Standard 208: (A) the Safety Act does not authorize either the delay until the 1982 model year or the ensuing phase-in program on the basis of wheelbase size;

**64.** *Automotive Parts & Accessories Ass'n v. Boyd, supra* note 36, 407 F.2d at 342.

**65.** Several anticipated hazards, such as possible hearing loss from the noise of the bags inflating or damage resulting from the impact with eyeglasses or smoking materials, have proved insubstantial in testing. *Adams Decision, supra* note 5, at 31, JA 186.

**66.** *Explanation* (Inadvertent Activation), *supra* note 25, at 2, JA 269.

**67.** *Id.* The test used male and female drivers between the ages of 18 and 72. The major flaw of the test is that the drivers were told something unexpected would happen while they were in the car, so their alertness was probably higher than normal. Nevertheless, the tests demonstrate that the force of airbag inflation can be weathered by many drivers.

**68.** *Adams Decision, supra* note 5, at 29–30, JA 184–185.

**69.** *Id.*

**70.** One out-of-position passenger—an infant—died in an airbag car in a frontal crash, but that death probably could not have been prevented by any passenger restraint system. *See* note 49 *supra.*

**71.** *Adams Decision, supra* note 5, at 46, JA 201.

**72.** Petitioners also assert that the passive restraint rule violates the individual's right to privacy. We find no basis for this contention. Passive restraints protect not only the owner or driver of the car, but also any passengers, and thus involve more than a purely individual concern. Also, by their very nature passive restraints involve no intrusion on an intimate area of activity, as in cases concerning the family or procreation decisions where courts have defended privacy interests. *See, e. g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Revised Standard 208 is a reasonable exercise of the Government's authority to guard our citizen's health and safety. *See Simon v. Sargent,* 346 F.Supp. 277 (D.Mass.) (three-judge court), *aff'd,* 409 U.S. 1020, 93 S.Ct. 463, 34 L.Ed.2d 312 (1972) (upholding state mandatory helmet law for motorcyclists); *Love v. Bell,* 171 Colo. 27, 465 P.2d 118 (1970) (same); *Bisenius v. Karns,* 42 Wis.2d 42, 165 N.W.2d 377, *appeal dismissed for lack of substantial federal question,* 395 U.S. 709, 89 S.Ct. 2033, 23 L.Ed.2d 655 (1969) (same).

and (B) the delay and phase-in were improperly adopted to avoid congressional rejection of the standard under the arguably unconstitutional one-house veto provision of the 1974 Amendments to the Safety Act.

### A. Delay and Phase-In

■ Petitioners argue first that the Secretary did not satisfy the Safety Act's requirement that he demonstrate "good cause" for not implementing the new safety standard within one year of issuance.[73] They contend that "mere" economic hardship cannot constitute such cause when the statute's central goal—greater vehicle safety—is at stake. In his decision the Secretary explained the delay until model year 1982 as an attempt to assure "orderly implementation" of the new standard.[74] The four-year lead-in period, according to the Secretary, grants car and airbag manufacturers breathing room to gear up production.[75] Moreover, by encouraging voluntary production of cars with passive restraints before the 1982 models the Secretary hopes to increase the public's familiarity with the systems and facilitate their eventual acceptance.[76]

We cannot agree with petitioners on this point. Although the time limit placed on implementation of new safety standards reflects Congress' conviction that safety must be a high national priority, Congress also provided the "good cause" exception along with the general requirement of practicabil-

ity. When dealing with a "technology-forcing" rule like Standard 208, the agency must consider the abilities of producers to comply with the new requirement and of the public to grasp the need for the change. On this record, these concerns were good cause for the delay in implementation.

■ Petitioners also insist that the Secretary lacked statutory authority to schedule introduction of airbags according to the size of a car's wheelbase. We find no basis for this protest in the statute. Section 103(f)(3) of the Safety Act provides that the Secretary shall

> consider whether any such proposed standard is reasonable, practicable and appropriate for the particular *type* of motor vehicle or item of motor vehicle equipment for which it is prescribed[.] [77]

Petitioners; relying on "common sense," interpret "type" as referring to distinctions between vehicle functions, such as passenger cars and trucks, not vehicle size. We view the term as including both distinctions, in the effort to provide the Secretary with sufficient flexibility to tailor safety standards to engineering realities. In this instance it will be far easier to install airbags in larger cars than smaller, simply because there is more room for the system in the larger cars.[78] The Secretary reasonably decided on a phase-in because of the difficulty of providing airbags in smaller cars and the likely usefulness to that endeavor of experience with larger cars.[79]

---

73. 15 U.S.C. § 1392(c) (1976). The law provides that safety standards shall take effect not \* \* \* sooner than one hundred and eighty days or later than one year from the date such order is issued, unless the Secretary finds, *for good cause shown*, that an earlier or later effective date is in the public interest; and publishes his reasons for such finding. *Id.* (emphasis added).

74. *Adams Decision, supra* note 5, at 40, JA 195.

75. Current production of sodium azide, the primary gas for inflating airbags, will have to be increased approximately tenfold to equip the annual output of cars in this country. *Id.* at 38, JA 193. Significant engineering and design problems arise with airbags as well, especially in small cars. *See* text at note 78 *infra.*

76. *Adams Decision, supra* note 5, at 40–41, JA 195–196.

77. 15 U.S.C. § 1392(f)(3) (1976) (emphasis added).

78. The introduction of airbags in small cars will require redesigning of the instrument panel, glove compartment, and air conditioning system, and possibly even of the wheelbase and engine compartment. *Adams Decision, supra* note 5, at 36, JA 191.

79. Petitioners emphasize that small cars provide the least crash protection to occupants and, accordingly, present the greatest need for passive restraints. Thus they argue that the implementation timetable is unfair because it leaves small car riders without passive restraints longer. Although we share petitioners' concern for small car riders, there is a rational basis for the Secretary's schedule, so we have no basis for upsetting his decision on this point.

B. *Legislative Veto*

 Petitioners allege that Standard 208 should not stand because the prospect of the one-house veto established by the 1974 amendments distorted the Secretary's decision on the implementation schedule. As we have discussed, substantial basis exists in the record for the Secretary's timetable for passive restraints. Petitioners' assertion is supported only by an arguable inference from one event in the record.[80] In the absence of concrete evidence, we must accept the substantial reasons offered by the Secretary for his decision.[81]

Petitioners also claim that revised Standard 208 was not covered by the legislative veto provision because a "belt system" can satisfy its requirements.[82] Thus they argue that Standard 208 should not have been submitted to Congress at all. We decline to reach this statutory interpretation question. Even if we assume that the Secretary was not compelled to send the standard to Congress, we can discern no consequences of his action that would constitute cause to vacate the standard.

Finally, petitioners challenge the constitutionality of the legislative veto provision. Following this court's decision in *Clark v. Valeo*,[83] we will not review this contention in a case where Congress has not exercised the veto and where there has been no showing of direct congressional influence over the rulemaking process. In such circumstances there is serious question whether a "case or controversy," as required by Article III of the Constitution, is presented.

Accordingly, the Secretary's order is

*Affirmed.*

---

**80.** Petitioners cite only the Secretary's failure to follow the recommendation of NHTSA for full implementation by September 1, 1980. That the Secretary did not adopt that suggestion is scarcely ground for inferring that "political realities," rather than technological concerns, dictated his action.

**81.** *See Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Nat'l Courier Ass'n v. Board of Governors of FRS*, 170 U.S.

App.D.C. 301, 314, 516 F.2d 1229, 1242 (1975) ("Unless he has left no other record of the reasons for his decision, the mental processes of an administrator may not be probed.").

**82.** *See* 15 U.S.C. § 1410(b)(3)(A) (1976).

**83.** 182 U.S.App.D.C. 21, 28, 559 F.2d 642, 649 (*en banc*) (*per curiam*), aff'd, 431 U.S. 950, 97 S.Ct. 2667, 53 L.Ed.2d 267 (1977).